[No. F062554. Fifth Dist. Dec. 5, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
PHAYVANH DYDOUANGPHAN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I. of the Discussion.

776

COUNSEL

Robert L. S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CORNELL, J.**—When a group of thieves stole marijuana from his legal marijuana garden, appellant Phayvanh Dydouangphan shot at their vehicle as they drove away. One of the thieves, Stanley Dale Wallace, was killed. Dydouangphan testified that someone in the getaway vehicle had pointed a gun at him and he fired in self-defense.

Dydouangphan was charged with first degree murder (Pen. Code, § 187, subd. (a)),[1] but the jury returned a verdict of voluntary manslaughter (§ 192, subd. (a)). In addition, the jury found Dydouangphan guilty of the charged crimes of assault with a firearm (§ 245, subd. (a)(2)) and shooting at an occupied vehicle (§ 246). Various enhancements also were found true, the most significant of which was that Dydouangphan personally discharged a firearm resulting in great bodily injury or death within the meaning of section 12022.53, subdivision (d). He was sentenced to a term of three years on the section 246 violation and 25 years to life for the section 12022.53, subdivision (d) enhancement. The sentence on the voluntary manslaughter conviction was imposed concurrently.

Dydouangphan argues the trial court erred in instructing the jury and in failing to stay the sentence on the voluntary manslaughter conviction pursuant to section 654. We conclude there was no error and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

The testimony was mostly consistent, therefore only a short summary is necessary. Dydouangphan had the appropriate documents to allow him to grow marijuana for medicinal purposes. He planted a marijuana garden in his backyard. The plants grew to a height that permitted people on the street to see the plants over a six-foot fence. Thefts became a problem, so Dydouangphan kept three dogs in the backyard and took other measures to protect his crop.

The events on the day of the shooting largely were presented through four witnesses, Richard Alfred Scott Young, George Helton, Sarah Resendez, and Nicole Green, each of whom participated in the attempted theft from Dydouangphan's marijuana garden.[2] While each witness attempted to minimize his or her role in the crime, the relevant facts essentially were consistent.

The decedent, Wallace, appeared to be the instigator of the plot. Young and Wallace had walked by Dydouangphan's residence to observe the marijuana garden prior to the theft. They decided to return later that night.

---

[1] All further statutory references are to the Penal Code.

[2] Young, Helton, and Resendez were granted immunity pursuant to section 1324 prior to their testimony. Green declined immunity or the services of an attorney.

Young and Wallace recruited Resendez and Green to join them; Green had access to her father's pickup truck. They drove to Dydouangphan's residence and again walked by the marijuana garden. Young claimed he was uncomfortable with the theft, so Green drove the four to a motel, where Helton was picked up. Green then drove all five towards Dydouangphan's residence. On the way, they saw a white van occupied by some acquaintances. They stopped the van and Wallace, and perhaps others in the pickup, got out of the pickup to speak with the occupants of the van. The occupants of the van decided to join in the theft, so both vehicles headed to Dydouangphan's residence.

When they arrived, the men from both vehicles jumped out, pulled down a portion of the fence that surrounded the marijuana garden, and started pulling plants out of the ground.

Dydouangphan woke up when the commotion caused his dogs to bark. He went into the backyard, saw the men, and returned to the house to get his shotgun. When he returned to the backyard, he fired one warning shot into the air. The men ran towards the vehicles with marijuana in their arms. The van took off before the men arrived at the vehicle. The marijuana was thrown into the bed of the pickup and everyone climbed into the pickup, two in front and five in back.

When escaping the scene, Green inexplicably drove a route that took the pickup past the front of Dydouangphan's residence. While each of the prosecution witnesses testified they never saw any thief with a gun, they also admitted they were not certain if anyone had a gun or not.

Dydouangphan testified the pickup slowed down as it approached the front of his residence and one of the men on the passenger side of the vehicle pointed a handgun at him. Dydouangphan, fearing for his life, aimed his shotgun at the pickup and fired. The shot broke out the front passenger window of the pickup and two pellets struck Wallace. One of the pellets struck his forehead and entered his brain. Although Wallace survived for a few days, he died as a result of the injury.

After Wallace was shot, Green drove the pickup to a nearby park and all of the men ran away. Green and Resendez attempted to hide the marijuana in the park. After the marijuana was unloaded, Green sought help from some workers in the vicinity. No gun was ever found in the pickup or park, although the marijuana was recovered.

The issue at trial was whether Dydouangphan shot in self-defense or committed murder. The prosecution argued there was no gun and that Dydouangphan shot at the pickup because he was frustrated with people

stealing his marijuana. Defense counsel argued that the only reason Green would drive by and slow down in front of Dydouangphan's residence was because one of the men wanted to intimidate or shoot at Dydouangphan. He explained the lack of a gun by pointing out that four men ran from the pickup before the police arrived, and one of them undoubtedly had the gun with him. He also attacked the credibility of the prosecution's witnesses, including pointing out the unlikely claim by the witnesses who testified that they did not know any of the men in the van, including the two who entered the pickup after fleeing Dydouangphan's residence.

The jury convicted Dydouangphan of the lesser included offense of voluntary manslaughter (§ 192, subd. (a)), as well as assault with a firearm (§ 245, subd. (a)(2)) and shooting at an occupied vehicle (§ 246). It also found true the allegations that Dydouangphan personally used a firearm during commission of the offense (§ 12022.5, subd. (a)) (counts 1 and 2) and personally discharged a firearm during commission of the felony causing great bodily injury or death (§ 12022.53, subd. (d)) (counts 1 and 3). Dydouangphan was sentenced to a determinate term of three years, plus an indeterminate term of 25 years to life for the section 12022.53 enhancement.

## DISCUSSION

### I. Jury Instructions[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. Section 654

▇ The trial court chose the shooting at an occupied vehicle conviction (§ 246) as the principal term and imposed a concurrent term for the voluntary manslaughter conviction (§ 192, subd. (a)). Dydouangphan argues the trial court erred when it failed to stay the punishment for the voluntary manslaughter conviction pursuant to section 654. Imposition of concurrent sentences is incorrect if section 654 prohibits multiple punishment, even though there is no practical difference between the two approaches. (*People v. Jones* (2012) 54 Cal.4th 350, 353 [142 Cal.Rptr.3d 561, 278 P.3d 821] (*Jones*).) Instead, the correct approach is to stay the sentence on the count for which punishment is precluded. (*Ibid.*)

▇ Section 654, subdivision (a) states that an act "that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in

---

[*]See footnote, *ante*, page 772.

no case shall the act or omission be punished under more than one provision." It is well settled that this subdivision concerns only multiple punishment, not multiple convictions. (*People v. Harrison* (1989) 48 Cal.3d 321, 335 [256 Cal.Rptr. 401, 768 P.2d 1078].)

The last phrase of section 654, subdivision (a) is at issue here. On its face, it prohibits punishing one action multiple times. "In *Neal*[ *v. State of California* (1960)] 55 Cal.2d 11 [9 Cal.Rptr. 607, 357 P.2d 839], the court added a 'gloss' to section 654 that has been a subject of continuing controversy and given rise to much confusion." (*People v. Correa* (2012) 54 Cal.4th 331, 335 [142 Cal.Rptr.3d 546, 278 P.3d 809] (*Correa*).) Indeed, the Supreme Court has issued five opinions in the last year focused on the controversy and confusion created by section 654.[3]

█ The "gloss" added in *Neal* was establishing a test to determine whether a continuing course of conduct that results in multiple criminal acts can be punished more than once. The Supreme Court held that "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California, supra*, 55 Cal.2d at p. 19.)

The Supreme Court criticized this test in *People v. Latimer* (1993) 5 Cal.4th 1203 [23 Cal.Rptr.2d 144, 858 P.2d 611] but felt compelled to retain it because of the principle of stare decisis. (*Id.* at pp. 1205–1206.) "In some respects, the sentencing structure we have today would be different but for the *Neal* line of cases. To overrule them now would result in a sentencing scheme intended by no one." (*Ibid.*)

---

[3] (1) *People v. Sanders* (2012) 55 Cal.4th 731 [288 P.3d 83] (while a felon in possession of two guns could be convicted of four crimes [two counts of violation of former § 12021, subd. (a)(1) and two counts of violation of former § 12021.1, subd. (a)], § 654 permitted the defendant to be punished only for the two violations of former § 12021.1, subd. (a)), (2) *Correa, supra*, 54 Cal.4th at pages 334, 343–344 (§ 654 does not prohibit punishment for multiple violations of the same law, overruling fn. 1 in *Neal*), (3) *Jones, supra*, 54 Cal.4th at pages 357–358 (§ 654 prohibits multiple punishment for violations of possession of a firearm by a felon [§ 29800, subd. (a)(1)], carrying a concealed and unregistered firearm [§ 25400, subd. (c)(6)], and carrying an unregistered loaded firearm in public [§ 25850, subd. (c)(6)], all based on the same act, overruling *In re Hayes* (1969) 70 Cal.2d 604 [75 Cal.Rptr. 790, 451 P.2d 430] and disapproving *People v. Harrison* (1969) 1 Cal.App.3d 115 [81 Cal.Rptr. 396]), (4) *People v. Mesa* (2012) 54 Cal.4th 191 [142 Cal.Rptr.3d 2, 277 P.3d 743] (§ 654 prohibits punishment for violation of § 186.22 where the defendant also is convicted of a substantive offense that comprises one of the elements of the § 186.22 violation), and (5) *People v. Ahmed* (2011) 53 Cal.4th 156 [133 Cal.Rptr.3d 856, 264 P.3d 822] (*Ahmed*) (§ 654 may apply to prohibit multiple punishment for multiple enhancements to a single crime).

Dydouangphan points out that both the convictions for firing at an occupied vehicle and voluntary manslaughter were the result of the single shot he fired at the pickup, as was the enhancement for personally firing a firearm causing great bodily injury. According to Dydouangphan, the failure to stay the punishment on one of the counts resulted in multiple punishment for a single action.

■ The People argue that section 654 does not apply to the convictions for firing at an occupied vehicle and voluntary manslaughter because of the multiple-victim exception to the statute. The Supreme Court explained in *People v. McFarland* (1989) 47 Cal.3d 798, 803 [254 Cal.Rptr. 331, 765 P.2d 493] that " 'A defendant may properly be convicted of multiple counts for multiple victims of a single criminal act . . . where the act prohibited by the statute is centrally an *"act of violence* against the person." ' [Citations.]" "We have long held that 'the limitations of section 654 do not apply to crimes of violence against multiple victims.' [Citation.] As we have explained: 'The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability. A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. This distinction between an act of violence against the person that violates more than one statute and such an act that harms more than one person is well settled. Section 654 is not ". . . applicable where . . . one act has two results each of which is an act of violence against the person of a separate individual." [Citations.]' [Citation.]" (*People v. Oates* (2004) 32 Cal.4th 1048, 1063 [12 Cal.Rptr.3d 325, 88 P.3d 56].)

Dydouangphan impliedly concedes that shooting at an occupied vehicle is an act of violence against the person, a concession with which we agree. Since there were at least seven individuals in the pickup when Dydouangphan shot at it, his action was likely to cause harm to several people, resulting in Dydouangphan being more culpable than a defendant who harms only one person. The potential for harm to multiple individuals is even more obvious if one remembers that Dydouangphan shot at the pickup with a shotgun using a shell that contained between nine and 12 pellets. Therefore, the multiple-victim exception is applicable in this case and section 654 would not preclude punishment for the shooting at an occupied vehicle conviction and the voluntary manslaughter conviction.

Nonetheless, Dydouangphan asserts section 654 applies because the voluntary manslaughter conviction would punish him for the death of Wallace, and

he already was punished for the death of Wallace when the section 12022.53, subdivision (d) enhancement was imposed on count 3. To support his position, Dydouangphan cites *People v. Wynn* (2010) 184 Cal.App.4th 1210 [109 Cal.Rptr.3d 457] (*Wynn*).

Wynn stole a carton of cigarettes from a retail store. When confronted by store security in the parking lot, Wynn threw down the cigarettes, denied wrongdoing, and resisted detention by using a nunchaku against security personnel. He was convicted of burglary (§ 459), three counts of petty theft with a prior conviction (§ 666), three counts of assault with a deadly weapon (§ 245, subd. (a)(1)), and one count of possession of a prohibited deadly weapon (former § 12020, subd. (a)(1)).

Wynn was sentenced on the three assault counts, the burglary count, and the possession of a prohibited weapon count. In addition, the trial court imposed a one-year enhancement because Wynn personally used a dangerous weapon in committing the burglary and petty thefts within the meaning of section 12022, subdivision (b)(1).

On appeal, Wynn asserted that section 654 required the sentence on several of the convictions be stayed. The appellate court first concluded there was substantial evidence to support the trial court's conclusion that Wynn had a different objective when committing the burglary (obtain cigarettes) and the assault counts (avoid arrest). (*Wynn, supra,* 184 Cal.App.4th at p. 1216.)

The appellate court next concluded that separate punishment for the possession of the deadly weapon count and the assault counts was appropriate because ". . . Wynn's possession of the nunchaku was ' "distinctly antecedent and separate from" ' the offense of assault with a deadly weapon [citation], and it could properly impose separate punishment for those offenses without running afoul of section 654." (*Wynn, supra,* 184 Cal.App.4th at p. 1218.)

Finally, the appellate court addressed the question of whether the sentence on the section 12022, subdivision (b)(1) enhancement must be stayed pursuant to section 654. The appellate court framed the issue as whether section 654 applied to enhancements that were based on the circumstances of the crime, an issue it found unresolved by the Supreme Court. (*Wynn, supra,* 184 Cal.App.4th at pp. 1218–1219.) The People conceded that if section 654 applied, then the sentence must be stayed because the conduct that resulted in the true finding on the enhancement was the same conduct that resulted in the assault convictions. The appellate court concluded section 654 applied and ordered the sentence on the enhancement stayed because the enhancement was "based on an *act or omission* performed by Wynn during the [assault counts], namely, using the nunchaku." (*Wynn,* at pp. 1219–1220.)

Dydouangphan argues that he is in the same position as Wynn, but he is incorrect. The *Wynn* court addressed the question of whether section 654 applied to an *enhancement* where the act giving rise to the enhancement already had been punished by imposition of a sentence on a *substantive crime*. Dydouangphan is in a different position because he seeks to apply section 654 to preclude punishment for a *substantive crime* because the same conduct already had been punished by imposition of a sentencing *enhancement*. This distinction leads us to reject Dydouangphan's reliance on *Wynn*.

■ A determinate sentence for a substantive crime may be lengthened, or enhanced, by a sentence enhancement. (*Ahmed, supra*, 53 Cal.4th at p. 161.) The Supreme Court has explained that "enhancements are different from substantive crimes . . . . Provisions describing substantive crimes . . . generally define criminal *acts*. But enhancement provisions do not define criminal acts . . . . They focus on *aspects* of the criminal act that are not always present and that warrant additional punishment. [Citations.]" (*Ahmed*, at p. 163.)

The issue decided by the Supreme Court in *Ahmed* was whether section 654 prevented a defendant from being punished for multiple enhancements as the result of a single act. Ahmed was convicted of assault with a firearm after he shot his girlfriend in the stomach. (§ 245, subd. (a)(2).) The trial court imposed enhancements for both personal use of a firearm (§ 12022.5, subd. (a)) and infliction of great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)). Ahmed argued that application of section 654 precluded punishment for both enhancements.

■ The Supreme Court concluded "that a court deciding how multiple enhancements interact should first examine the specific sentencing statutes. If, as is often the case, these statutes provide the answer, the court should apply that answer and stop there. Because specific statutes prevail over general statutes, consideration of the more general section 654 will be unnecessary. Only if the specific statutes do not provide the answer should the court turn to section 654. We conclude that section 654 does apply in that situation, but the analysis must be adjusted to account for the differing natures of substantive crimes and enhancements." (*Ahmed, supra*, 53 Cal.4th at pp. 159–160.)

■ In reaching this conclusion, the Supreme Court recognized not only the distinction between substantive crimes and enhancements, but also the different types of sentence enhancements. The first category of sentence enhancements addresses the nature of the defendant, usually his or her status as a repeat offender. (*Ahmed, supra*, 53 Cal.4th at p. 161.) The Supreme Court previously held that section 654 does not apply to this type of enhancement. (*People v. Coronado* (1995) 12 Cal.4th 145, 156–159 [48 Cal.Rptr.2d 77, 906 P.2d 1232].)

The second category of sentence enhancements focuses on the " '*circumstances of the crime* and typically focus[es] on what the defendant did when the current offense was committed.' [Citation.]" (*Ahmed, supra*, 53 Cal.4th at p. 161.) The enhancements in *Ahmed*, and in this case, are of the second type because they focus on the use of a firearm as well as the infliction of great bodily injury or death.

Focusing on the second type of enhancement, the Supreme Court noted that whether two enhancements could be applied as a result of the same act often could be determined by the sentencing statutes themselves. (*Ahmed, supra*, 53 Cal.4th at p. 163.) If the enhancement statutes resolve the issue, then section 654 is inapplicable "because a specific statute prevails over a more general one relating to the same subject. [Citation.] The court should simply apply the answer found in the specific statutes and not consider the more general section 654." (*Ahmed*, at p. 163.)

■ If the enhancement statutes do not answer the question of whether two enhancements can apply to the same act, then the trial court should apply section 654 because enhancements are " 'provisions of law' under which an 'act or omission' is 'punishable.' " (*Ahmed, supra*, 53 Cal.4th at p. 163.)

"But enhancements are different from substantive crimes, a difference that affects *how* section 654 applies to enhancements. Provisions describing substantive crimes, such as the assault with a firearm of this case, generally define criminal *acts*. But enhancement provisions do not define criminal acts; rather, they increase the punishment for those acts. They focus on *aspects* of the criminal act that are not always present and that warrant additional punishment. [Citations.]

"Sometimes separate enhancements focus on different aspects of the criminal act. Here, for example, the personal use of a firearm and the infliction of great bodily injury arose from the same criminal act—shooting the victim. The personal use of a firearm was an aspect of that act that, the Legislature has determined, warrants additional punishment; similarly, the infliction of great bodily injury is a different aspect of that act that, the Legislature has determined, also warrants additional punishment. Conversely, sometimes separate enhancements focus on the same aspect of a criminal act. For example, numerous weapon enhancements exist. (E.g., §§ 12022, subd. (a) [being armed with a firearm], 12022.5 [use of a firearm], and 12022.53, subd. (b) [use of a firearm in the commission of specified offenses], 12022.53, subd. (c) [discharging a firearm in the commission of specified offenses].) As another example, numerous great-bodily-injury enhancements exist. (E.g., § 12022.7, subd. (a) [a general great-bodily-injury enhancement], subd. (b) [great bodily injury causing the victim to become comatose or suffer permanent paralysis], subd. (c)

[great bodily injury on a person 70 years of age or older], subd. (d) [great bodily injury on a child under the age of five years], and subd. (e) [the enhancement in this case].)

"In this case, both the firearm use and the infliction of great bodily injury were part of the same physical act as the substantive crime itself. If section 654 barred *any* additional punishment for a single criminal act, then no enhancement at all would be permitted, a result obviously inconsistent with the function of sentence enhancements. Thus, when applied to multiple enhancements for a single crime, section 654 bars multiple punishment for the same *aspect* of a criminal act." (*Ahmed, supra,* 53 Cal.4th at pp. 163–164, fn. omitted.)

■ The Supreme Court next analyzed the two enhancements imposed by the trial court and concluded the Legislature intended to permit "the sentencing court to impose both one weapon enhancement and one great-bodily-injury enhancement for *all* crimes." (*Ahmed, supra,* 53 Cal.4th at p. 168.)

■ *Ahmed* explained that enhancements do not punish a criminal act, but instead apply when certain aspects of the criminal act have been determined to merit *increased* punishment.

Here, the *aspect* of the criminal act that the Legislature has determined requires *increased* punishment is the personal use of a firearm that caused death. The *criminal acts* being punished are the voluntary manslaughter and shooting at an occupied vehicle. It is illogical to use a provision intended to increase punishment for an aspect of a criminal act to preclude punishment for the criminal act itself.

■ Moreover, literal application of section 654 would result in a bar to imposition of any sentence enhancement, "a result obviously inconsistent with the function of sentence enhancements." (*Ahmed, supra,* 53 Cal.4th at p. 164.) Similarly, application of section 654 to prevent punishment for a criminal act because the act was punished by imposition of a sentence enhancement also would be a result inconsistent with the function of sentence enhancements.

■ The result sought by Dydouangphan also would be inconsistent with the language of the enhancement. Section 12022.53, subdivision (d) states that "[n]otwithstanding any other provision of law," any person who commits specified crimes and uses a gun causing death "shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." By its terms, section 654 does not apply to imposition of the term of imprisonment required by section 12022.53 (notwithstanding any

other provision of law). In addition, the punishment required by the enhancement is to be additional and consecutive to the term imposed for the criminal act. If the enhancement is used to preclude punishment for the criminal act that would otherwise be imposed but for the enhancement, the enhancement would not result in additional punishment. Instead, imposition of the enhancement would result in less punishment for the criminal act. This cannot be what the Legislature intended.

Finally, we note that under the facts of this case, application of section 654 could lead to an absurd result. If the trial court had imposed the section 12022.53 enhancement on the voluntary manslaughter conviction, then section 654 would not apply to preclude punishment for the shooting at an inhabited vehicle conviction. The act being punished by the enhancement, using a gun to kill Wallace, was the same act punished by the voluntary manslaughter conviction, but was not the same act as the section 246 conviction—shooting at an inhabited vehicle containing multiple potential victims. Since section 654 would not preclude punishment for both the voluntary manslaughter conviction and the section 246 conviction, logic compels the conclusion that section 654 would not apply to preclude punishment for both the enhancement and the section 246 conviction.

■ The trial court did not apply the enhancement to the voluntary manslaughter conviction because voluntary manslaughter is not one of the crimes listed in section 12022.53, subdivision (a), so the enhancement could not be imposed on that conviction. Under section 12022.53, subdivision (d), the enhancement could be imposed on a section 246 conviction when the criminal act resulted in great bodily injury or death. Therefore, the trial court properly imposed the enhancement on the section 246 conviction.

Dydouangphan, however, was prosecuted for first degree murder. If the jury had found him guilty of either first or second degree murder, which would not have been an unreasonable result, the trial court would have imposed the enhancement on that conviction and also sentenced Dydouangphan on the shooting at an inhabited vehicle conviction. It would be anomalous to apply section 654 to preclude punishment for the voluntary manslaughter conviction in this case when, if the jury had returned a verdict of first or second degree murder, section 654 would not have applied to either the murder conviction or the section 246 conviction.

■ For each of these reasons, we conclude that section 654 does not apply to preclude imposition of punishment for a criminal act even where a sentence enhancement was imposed for the same conduct.

## DISPOSITION

The judgment is affirmed.

Wiseman, Acting P. J., and Kane, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 13, 2013, S207838.