Filed 3/18/14  P. v. Roberts CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILLIAM SCOTT ROBERTS,<br><br>    Defendant and Appellant. | B241838<br><br>(Los Angeles County<br>Super. Ct. No. BA389938) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stan Blumenfeld, Judge.  Affirmed as corrected with directions.

Alan Stern, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

The People charged defendant William Scott Roberts in an information with one count of making a criminal threat (Pen. Code,[1] § 422; count 1), one count of dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1); count 2), and 12 counts of dissuading a witness from testifying (*id*., subd. (a)(1); counts 3 through 14). As to all counts, the People alleged that Roberts had suffered three prior serious or violent felony convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12) and three serious felony convictions (§ 667, subd. (a)), and that he had served five prior prison terms (§ 667.5, subd. (b)).

Prior to jury selection, the trial court granted the People's motion to dismiss counts 3, 9, 10 and 12 pursuant to section 1385. The jury acquitted Roberts of making a criminal threat but found him guilty of the remaining charges. Roberts then waived his right to a trial on the prior conviction allegations and admitted he had suffered the three 1981 robbery convictions that served as the basis for the three strikes and serious felony conviction enhancement allegations. With respect to the prior prison term allegations, the People noted that the trial court could only impose two one-term enhancements, but the People decided not to request those enhancements.

On Roberts' motion pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, the trial court, over the People's objection, struck two of Roberts' strike convictions. The court then sentenced Roberts to state prison for a total term of 13 years consisting of four years on count 2 (the middle term of two years, doubled pursuant to the three strikes law), a consecutive term of four years on count 4 (the middle term of two years, doubled pursuant to the three strikes law), plus five years for the prior serious felony conviction pursuant to section 667, subdivision (a)(1). The court imposed concurrent terms on the remaining counts.

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

Roberts argues that the trial court abused its discretion in answering a question from the jury regarding count 2, and in the alternative that trial counsel for Roberts was ineffective in failing to request "a more precise response" to the jury's question. Roberts also argues that the trial court abused its discretion in striking only two of his three prior strike convictions, and that the trial court should have stayed the sentence on one of the counts pursuant to section 654. Finally, Roberts seeks amendment of the abstract of judgment to correct a clerical error. We direct the trial court to correct the minute order of the sentencing hearing and the abstract of judgment to conform to the oral pronouncement of sentence, and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Assault in Las Vegas*

In July 2011 Roberts and his girlfriend Sandra Bailey traveled from Los Angeles to Las Vegas by bus and stayed at the Fun City Motel. The couple had been dating for seven or eight years. Bailey, who had been living in a nursing home, had serious medical issues. She had a cast and a colostomy bag, and she used a wheelchair.

One day Roberts and Bailey went to a casino. Roberts returned to the hotel to take a shower, while Bailey remained at the casino and waited for Roberts to return. Although Bailey had her walker, she needed Roberts' help. When Roberts did not return to the casino, Bailey took a cab back to the motel where she found Roberts asleep. Bailey started screaming at Roberts and startled him. Roberts, who preferred to wake up "gently," struck Bailey in the face, causing bruising. Roberts only hit Bailey once and, according to Bailey, this was the first time Roberts had ever hit her.

Later that night, Roberts and Bailey were in bed when officers from the Las Vegas Police Department came to their motel room. Bailey told the officers she was fine, and they left.

Roberts and Bailey returned to Los Angeles by bus on July 14, 2011 in the early morning hours. Bailey ate something that upset her stomach and obstructed her

3

colostomy bag.  Because the buses were not operating at that time, Roberts and Bailey sat on a bench and waited.  Eventually they made their way to another location where they both fell asleep while waiting for a bus.  When Bailey woke up, she felt worse.  She saw a bus headed to Cedars-Sinai Medical Center (Cedars), where she normally went for medical care.  She could not awaken Roberts, and got on the bus alone.

B.      *Counts 1 and 2*

Dr. Daniel Hoh treated Bailey in the emergency room at Cedars.  Dr. Hoh documented that Bailey had a black right eye.  Bailey informed the physician that her boyfriend had assaulted her three days earlier but she did not want to file a police report because she feared retaliation.  Cedars admitted Bailey and placed her in a private room.

On the morning of July 15, 2011 hospital social worker Gail Weiss-Bogan went to see Bailey after receiving a referral from emergency room personnel.  Weiss-Bogan, warned that someone might be in Bailey's room, quietly introduced herself to Bailey and asked if they were alone.  Bailey said they were not.  When Weiss-Bogan asked Bailey if Bailey's boyfriend was in the bathroom, Bailey, who appeared anxious and afraid, nodded her head.  Bailey again nodded her head when Weiss-Bogan asked if she was afraid and concerned for her safety.

Roberts then walked out of the bathroom.  Weiss-Bogan introduced herself to Roberts and asked him to step out of the room so she could talk to Bailey in private. Roberts refused, stating, "No, I am not going to leave the room because there is nothing private between us and I'm not leaving."  Weiss-Bogan explained that it was standard procedure for her to talk to the patient in private.  Roberts still refused to leave and appeared unconcerned when Weiss-Bogan said she was going to call security.

Dr. Eugene Kim entered Bailey's room and heard Roberts refuse Weiss-Bogan's request to leave.  Roberts called Weiss-Bogan a "bitch," and Dr. Kim asked him to leave. Roberts finally agreed, but before leaving the room he told Bailey, "You don't have to

4

talk to them if I'm not here." Roberts told Bailey he loved her and again called Weiss-Bogan a "bitch."[2]

After Roberts left, Bailey told Dr. Kim she did not feel safe in Roberts' presence. She voiced concern for her physical safety and stated she did not want Roberts to beat her again. Bailey also shared that during the previous night, while Roberts was in her hospital room, he threatened to beat her again if she told anyone he had assaulted her.[3] Dr. Kim then examined Bailey. Although she was scared and anxious, she appeared to understand her situation and was alert and coherent. She did not appear under the effects of medication.

Following the examination Dr. Kim and Weiss-Bogan conferred. Weiss-Bogan called security and the police. Security escorted Roberts out of the hospital.

Los Angeles Police Officer Alfonso Rojas later interviewed Bailey at the hospital. When the officer asked Bailey about her black eye, Bailey said her boyfriend had punched her three days earlier when they were in Las Vegas and told her that he would kill her if she told the police. Because of this threat, she had covered her injury when the Las Vegas police officers came to the hotel room and told them that nothing had happened.[4] Bailey told Officer Rojas that she loved Roberts, that he did not mean to hit her hard, and that he had never hit her before.

After Officer Rojas left to get a camera, Weiss-Bogan saw Roberts returning to Bailey's room, wearing a different shirt. When Officer Rojas returned, Weiss-Bogan told

---

**2**    Bailey testified she did not remember any interaction between Roberts and hospital staff. She did not remember Weiss-Bogan visiting her in her room. Bailey was receiving a high dose of morphine at the time. Bailey also did not want to testify at Roberts' trial. She still loved him and did not want anything bad to happen to him.

**3**    At trial, Bailey testified that she did not remember making this statement to Dr. Kim. She also did not remember Roberts threatening her at Cedars.

**4**    Bailey testified that she did not remember making this statement to Officer Rojas.

him that Roberts was in Bailey's room. Officer Rojas saw Roberts in the bathroom and arrested him.

Detective Ronald Cade also interviewed Bailey in her hospital room. Bailey recounted that Roberts had hit her while they were in Las Vegas and threatened to kill her if she told the police about the assault. Bailey again stated that when the police arrived at their motel room, she covered up her injury and said she was fine. Bailey also told Detective Cade that she and Roberts had argued when Roberts came to her hospital room. Roberts threatened her again, telling her he would kill her if she told the police about the assault in Las Vegas.[5] Bailey told Detective Cade she was still afraid of Roberts. She also acknowledged that he had hit her before but she had never reported the abuse.

### C.  *Counts 4, 5, 6, 7, 8, 11, 13 and 14*

Roberts called Bailey from jail on September 20, 24, and 30, 2011, and twice on September 28. Roberts also called Bailey on October 2, 5 and 12. During each of these telephone conversations, Roberts tried to dissuade Bailey from testifying.

### D.  *Roberts' Version*

Roberts testified on his behalf. He admitted that he struck Bailey while they were in Las Vegas and gave her a black eye. This was the one and only time he hit her.

The next day Roberts and Bailey returned to Los Angeles by bus. After arriving, they took a cab directly to USC Medical Center where Bailey had a scheduled appointment. Roberts waited for Bailey outside with their luggage for four or five hours.

After Bailey's appointment at USC Medical Center they traveled to West Hollywood where they ate dinner at a restaurant called the French Quarter. While waiting at a bus stop Bailey complained that she did not feel well and said that she

---

**5**     At trial, Bailey did not remember telling Detective Cade about the argument or threat in her hospital room. She claimed that she was on drugs, in pain, and confused during her interview with the detective.

6

wanted to go to Cedars. Roberts asked Bailey if she could wait a few hours and hang out with him.**6** Eventually, Roberts fell asleep. When he woke up Bailey was gone. He called Cedars to confirm that Bailey was there.

By the time Roberts arrived at Cedars, Bailey already had been treated in the emergency room and was in a hospital room. Roberts obtained a visitor's pass and went to Bailey's room. Roberts fell asleep on a rollaway bed hospital staff brought for him.

Roberts woke up to the sound of Weiss-Bogan telling him he had to wake up and leave the room or she would call security. Roberts said he "immediately made the association that . . . she's rolling on this black eye, thinking that I did it," and "[e]ven though I did, she didn't know that, and that ticked me off."

Roberts asked Bailey, "Who's this?" and said, "Tell this to step out of the room." Roberts admitted that he was "nasty" to Weiss-Bogan. Roberts also said he "probably went to the bathroom." At some point a doctor said to Roberts, "Sir, will you please step out of the room," and Roberts agreed. As he walked out Roberts called Weiss-Bogan a "bitch," explaining, "She was rude so I was rude." Roberts admitted that on the way out of Bailey's room, he told Bailey, "Don't say anything to that woman." Roberts said this because he did not believe that Weiss-Bogan was acting in their best interests.

Security escorted Roberts to the lobby where he sat for a moment and then left. He walked to a bench, sat down, and smoked a cigarette. He opened a zipper on his bag and realized that some of his HIV medication was not in the bag. He changed his shirt "to avoid any further incidents with the Cedars hospital security" and then returned to Bailey's room at Cedars.

When Roberts entered Bailey's room, no one was there. He said to Bailey, "Sandy, where's that little zipper bag?" Roberts took the bag from Bailey and went into the bathroom so he could separate his medication from hers, leaving the bathroom door

---

**6**      Roberts denied that he was fearful that a doctor or social worker at the hospital would ask Bailey about her black eye and that he would get in trouble. He also denied that Bailey was afraid of him while she was at the hospital.

ajar. A police officer then appeared, asked him to place his hands behind his back, and took him away.

Roberts denied ever threatening Bailey. He also denied calling her from jail prior to September. He did not know what had happened to her. He was unable to speak with Bailey while he was in jail and she was at Cedars. After Bailey's doctors discharged her from Cedars and moved her into a nursing home, Bailey sent Roberts a card with a telephone number where he could reach her.

Roberts then began calling Bailey. From September 7 until October 12, Roberts called Bailey 38 times. During some of these calls he told Bailey not to go to court, and during others he told her to go to court. Roberts did not believe it was in their best interests for Bailey to go to court, and Bailey did not want to go to court. Roberts stated, "I didn't want her to go to court. Absolutely." Roberts also was upset because he was in custody and believed he had not committed a crime in Los Angeles. He denied threatening Bailey in Las Vegas or Los Angeles. He admitted that the only crime he committed was hitting Bailey in Las Vegas. At no time during the 38 conversations he had with Bailey did Roberts threaten Bailey with bodily harm. Roberts believed that he could not be prosecuted in Los Angeles for a crime committed in Las Vegas.

E.    *Proceedings at Trial Regarding Counts 1 and 2*

Throughout the trial the court, the prosecutor, and counsel for Roberts all emphasized that the charges against Roberts related to conduct that had occurred in Los Angeles at Cedars, not conduct that had occurred in Las Vegas at the Fun City Motel. The trial court instructed the jury at the beginning of the trial that the charges were based on conduct that occurred in Los Angeles. The court told the prospective jurors that "[t]he People allege that on or about July 15, 2011, in the County of Los Angeles, William Roberts, the defendant, threatened to harm Sandra Bailey if she told the police that he had hit her. And then he later discouraged her from attending or testifying in this case." During her opening statement to the jury, the prosecutor noted that "count 1 is a criminal threat count, and that is based on the threat that [Roberts] made to [Bailey] while at

8

Cedars-Sinai, the threat that she said he made when he said, 'If you say anything to anyone, I'll beat you up.' And that's the threat that [she] relayed to . . . Gail Weiss-Bogan and to Dr. Kim." The prosecutor further emphasized that count 2, dissuading a person from reporting a crime, was based on the same threat at Cedar-Sinai.

During closing argument, the prosecutor told the jury: "Ladies and Gentlemen, as we talked about in opening, the first [count] is a . . . section 422, which is a criminal threat. And in this count, this occurred, it's alleged to have occurred on July 15th, 2011. The criminal threat count deals with the threat that the defendant made to Sandra Bailey at Cedars-Sinai, the threat that Sandra Bailey relayed to the investigating officer and to Gail Weiss-Bogan. That is the basis of this count. And only that. Count 2 is a [section] 136.1, dissuading of a witness from reporting a crime. Count 2 also occurred on July 15th, 2011. And that only deals with the threat and the crime occurring in Cedars-Sinai. And this deals with the fact that the defendant told Sandra Bailey not to talk to anyone, and he was dissuading her when he threatened her from reporting the crime. So count 1 and count 2 are only things that occurred in Cedars-Sinai."

Counsel for Roberts stated to the jury in closing argument, "I told you in my opening we're going to pick a jury to find out what the truth was as to July 15th. What actually happened there at Cedars-Sinai." He also stated he was "going to talk about the criminal threat and the dissuading that happened, they allege, at the hospital." Counsel for Roberts further argued to the jury that Roberts "knew that what happened in Las Vegas couldn't be prosecuted here," and he argued that there was no threat or dissuasion on July 15th. Counsel for Roberts also stated that Roberts was "an easy target" because "people don't like him. You probably don't like him. I don't like him. I don't like what he does to Ms. Bailey. I don't like what he did to Ms. Bailey. I saw the photo." Counsel argued, however, "We're not here because of that." Counsel for Roberts emphasized that the prosecution had "to convince you beyond a reasonable doubt that he intended to dissuade her; that he made a criminal threat in L.A. County. It's her job to prove that. And I think we presented enough evidence that there is doubt in your head as to whether

9

any criminal threat was ever levied here in California, whether he actually intended for her to dissuade and discourage her from coming to court."

As noted, the jury acquitted Roberts on count 1, making a criminal threat at Cedars. The jury, however, convicted Roberts on count 2, dissuading a witness at Cedars.

# DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion in Responding to the Jury's Question Regarding Count 2*

Count 2 charged Roberts with intimidating a witness not to report a crime. With regard to this charge, the trial court instructed the jury in accordance with CALCRIM No. 2622 as follows:

"The defendant is charged in Count 2 with intimidating a witness. To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant maliciously tried to prevent or discourage Sandra Bailey from making a report to the police that she was a crime victim;

"2. Sandra Bailey was a crime victim; and

"3. The defendant knew he was trying to prevent or discourage Sandra Bailey from reporting to the police that she was a crime victim and intended to do so.

"A person acts maliciously when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice.

"A person is a victim if there is reason to believe that a federal or state crime is being or has been committed or attempted against him or her.

"It is not a defense that the defendant was not successful in preventing or discouraging the victim.

"It is not a defense that no one was actually physically injured or otherwise intimidated."

10

The court also gave the jury the following special instruction about the assault in Las Vegas: "You have heard evidence that the defendant struck Sandra Bailey in Las Vegas, Nevada. The defendant is not charged with assault in this case, and you may not convict him based on the assault. Nor should you speculate why certain charges were brought in this case while others were not. You may only consider the crimes charged in this case, and you may only convict the defendant of those crimes if the People have proven each element of those crimes beyond a reasonable doubt."

During deliberations the jury sent the trial court the following question: "In regards to count 2, the instruction states that Sandra Bailey must be 'a victim of a crime.' Can the crime be the assault in Las Vegas or must it be the criminal threat in Charge 1?"

Counsel for Roberts argued that, for purposes of the second element of the crime of witness intimidation, the victim must be a victim of a crime committed in California. The trial court disagreed, and ultimately responded to the jury's question by instructing the jury as follows: "'Victim' means any person with respect to whom there is reason to believe that any crime as defined under the laws of this state or any other state or of the United States is being or has been perpetrated or attempted to be perpetrated."

Roberts contends that "the jury was not seeking the definition of victim provided by the court," and that the trial court's response to the jury's question "failed to address the fact that in order to convict [him] on count 2, **that crime** had to have been committed in California." Roberts argues that "the jury was inquiring into whether [he] could be convicted on count 2 based on words spoken in Las Vegas." This is not a fair reading of the jury's question. Nothing in the jury's question suggests that it had any doubt that the act of dissuasion alleged in count 2 had to occur in Los Angeles. Rather, the jury's question reflected uncertainty regarding whether the assault in Las Vegas could render Bailey a crime victim within the meaning of the crime charged in count 2. The trial court answered the question the jury asked.

And the trial court answered it correctly. Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they

11

must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." This statutory provision requires the trial court "'to clear up any instructional confusion expressed by the jury." [Citation.]' [Citation.] 'This means the trial "court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the *court has discretion* under . . . section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information . . . ." [Citation.]' [Citations.] . . . [S]ection 1138 does not demand elaboration upon the standard instructions by the trial court when the jury expresses confusion, but rather directs the court to 'consider how it can best aid the jury and decide whether further explanation is desirable, or whether the reiteration of previously given instructions will suffice.' [Citation.]" (*People v. Yarbrough* (2008) 169 Cal.App.4th 303, 316-317.) We review the trial court's response to a question posed by a deliberating jury for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746; *People v. Hodges* (2013) 213 Cal.App.4th 531, 539.)

For purposes of section 136.1, "'[v]ictim' means any natural person with respect to whom there is reason to believe that any crime as defined under the laws of this state or any other state or of the United States is being or has been perpetrated or attempted to be perpetrated." (§ 136, subd. (3).) The trial court's answer to the jury's question was entirely consistent with this definition and correctly instructed the jury that, with respect to count 2, the crime of which Bailey was a victim could be the assault that occurred in Las Vegas or the criminal threat that occurred in Los Angeles and was charged in count 1. Roberts has not shown an abuse of discretion under section 1138. (See *People v. Waidla*, *supra*, 22 Cal.4th at pp. 745-746.)[7]

---

[7] At sentencing, counsel for Roberts argued that the jury's verdicts on counts 1 and 2 were inconsistent and that the guilty verdict on count 2 was based on conduct that

12

B.    *Roberts Was Not Denied Effective Assistance of Counsel*

Roberts contends that he was denied effective assistance of counsel because his trial counsel failed to ask for a modification of the trial court's answer to the jury's question to clarify that the act of dissuasion charged in count 2 must have occurred in California.[8]  "To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was deficient and fell below an objective standard of reasonableness and (2) it is reasonably probable that a more favorable result would have been reached absent the deficient performance."  (*People v. Jones* (2013) 217 Cal.App.4th 735, 746-747, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [104 S.Ct. 2052, 80 L.Ed.2d 674].)  "A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.'  [Citation.]"  (*Jones*, *supra*, at p. 747, citing *Strickland*, *supra*, at p. 694.)  We conclude that Roberts has failed to show that it is reasonably probable he would not have been convicted on count 2 if his trial counsel had requested that the trial court include in its answer to the jury's question a statement that the act of dissuasion must occur in California.  Therefore, we need not decide whether his trial attorney's performance was deficient.  (See *People v. Mercado* (2013) 216 Cal.App.4th 67, 81 ["[a]n appellate court 'need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a

occurred in Las Vegas.  The trial court treated counsel for Roberts' argument as a motion to dismiss count 2 and denied the motion.  The trial court noted that it was "highly, highly likely" the jury acquitted Roberts on count 1 based on a reasonable doubt that Bailey was in sustained fear in light of Bailey's testimony that she was not afraid and her numerous post-threat attempts to contact Roberts.  The trial court noted that perhaps the instructions could have been clearer and that the court would have clarified the matter had counsel asked the court to do so.  In the trial court's view, however, the totality of instructions made it clear that the jury could not convict Roberts on count 2 based on statements he made in Las Vegas.  We agree with the trial court's assessment of the instructions.

[8]    With regard to count 1 alleging criminal threats, the trial court instructed the jury that the People had to prove, among other things, that "[t]he defendant made the threat orally in Los Angeles."

13

result of the alleged deficiencies"]; *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1373 [absent a showing of prejudice resulting from counsel's alleged deficient performance, the reviewing court need not decide "whether his counsel's performance fell below an objective standard of reasonableness"].)

The instructions by the trial court, and the opening statements and closing arguments of counsel, leave no doubt that the sole focus of counts 1 and 2 was the events that occurred on July 15, 2011 at Cedars. The trial court, the prosecutor, and counsel for Roberts, all told the jury that counts 1 and 2 were based on conduct that occurred in Los Angeles. Because our review of the record does not reveal any possible basis that would have permitted the jury to convict Roberts of count 2 as a result of conduct occurring anywhere but in Los Angeles, counsel for Roberts' failure to ask for a modification of the court's answer to the jury's question was not prejudicial. Therefore, Roberts' has failed to demonstrate that he was denied effective assistance of counsel.

C.    *The Trial Court Did Not Abuse Its Discretion in Striking Only Two of Roberts' Three Prior Strike Convictions*

Prior to sentencing, Roberts filed a motion pursuant to *People v. Superior Court (Romero)*, *supra*, 13 Cal.4th 497 asking the trial court to strike all three of his prior strike convictions pursuant to section 1385. The trial court exercised its discretion to strike two of his 1981 prior robbery convictions but not the third. Roberts challenges the trial court's ruling.

"In ruling on a *Romero* motion, the trial court 'must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.'" (*People v. Finney* (2012) 204 Cal.App.4th 1034, 1038, quoting *People v. Williams* (1998) 17 Cal.4th 148, 161.) "The court's ruling on a motion to strike is subject to a deferential abuse of discretion standard of review. [Citation.] A 'trial court

14

will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances. For example, an abuse of discretion occurs where the trial court was not "aware of its discretion" to dismiss [citation], or where the court considered impermissible factors in declining to dismiss.' [Citation.] The burden is on the party challenging the sentence to clearly show the sentence was irrational or arbitrary. [Citation.] Further, a sentence will not be reversed merely because reasonable people might disagree. ""'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"" [Citation.]" (*People v. Leavel* (2012) 203 Cal.App.4th 823, 837.)

The trial court first announced its tentative decision to strike two of Roberts' three strikes. The court explained: "And I have carefully considered the entire record before me and will suggest that this is a close call even for the court to strike two of the three prior strikes. I have considered the nature of the prior strikes. They are more than 30 years old. The defendant was 19 years old at the time. The priors did arise, it appears to the court, from a single act. And the court is able to consider that . . . . On the other hand, there is an aggravating factor in connection with the prior strikes, and that is, as the court understands it, the defendant was using a weapon at the time, a shotgun, I believe. And I believe further, that that this is dispositive, but he, in fact, was holding the shotgun. I also have considered the defendant's criminal record. In mitigation, the court has considered . . . that the defendant largely, but not entirely, has led a life free of violent criminal behavior after the [section] 211. As I say, largely, not entirely. In aggravation, he continued to engage in criminal conduct, although again, largely, although not exclusively, nonviolent, drug-related, some misdemeanors, a mix of criminal conduct as articulated in the People's opposition. I also am influenced, and probably for this court the factor that may tilt in favor of striking two of the three strikes is the nature of the current offense[,] which I find largely in mitigation. The defendant was found not guilty of the most serious of the charges, the [section] 422. Also, the court has considered the fact that these charges are violations of [section] 136.1, [subdivision] (a)(1), and the defense made much of the fact these are wobblers. And the People made, similarly,

15

much of the fact that nonetheless they're felonies and don't require use of force or fear. But in weighing the nature of these offenses, the court does consider the fact that the defendant did not threaten the victim, Ms. Bailey, not to appear. I had an opportunity, obviously, to hear those audiotapes, and while there were moments where Mr. Roberts was angry and frustrated and upset and was more intimidating, I think the best characterization of all those audiotapes is that he was trying to cajole without raising the specter of force or fear throughout the entire episode. And so the court has weighed carefully all of the factors. It is a mixed bag to say the least. The court could go either way, I think, reasonably on this matter and deny entirely the *Romero* motion, [and] sentence him with a three-strike past. The court also reasonably, in my judgment, can strike two of the strikes. In my view striking all of the strikes would not be appropriate in light of the weighing that the court has gone through."

The trial court then heard from Bailey, who stated that she loved Roberts. Bailey asked for leniency, explaining that she needed Roberts as her caretaker. The court explained that it could not place Roberts on probation and that he was facing a sentence of 25 years to life. The court then heard from counsel for Roberts, who agreed that the court could go either way on the *Romero* motion and asked the court to run count 4 concurrently with count 2 so that Roberts, who had AIDS, could have a chance of being released and spending time with Bailey. The prosecutor argued for a full three-strike sentence. He characterized the trial court's decision to impose a 13-year term as a gift and argued that anything less was not justified. The trial court ultimately struck two of Roberts' prior strike convictions and determined that its tentative sentence of 13 years was "reasonable given the totality of the circumstances."

In ruling on Roberts' *Romero* motion, the trial court properly considered all relevant criteria in deeming Roberts outside the spirit of the three strike scheme in part and striking two of his prior strikes for robbery. The court was well aware of its discretion to strike one or more strikes, and there is no indication that the court considered any impermissible factors in ruling on the motion. There is no basis for

16

disturbing the trial court's exercise of discretion in striking two of Roberts' three prior strike convictions.

D. *There Is Substantial Evidence That Section 654 Does Not Apply to the Two Telephone Calls on the Same Day*

At sentencing, the trial court mistakenly believed that counts 4, 5, 6, 7, 8, 11, 13, and 14 charged Roberts with violations of section 136.1, subdivision (a)(1), that occurred on different days. The court therefore concluded that section 654 did not apply to any of these counts. Counts 6 and 7, however, were based on telephone calls that Roberts made to Bailey on the same day, September 28, 2011.

On appeal, Roberts concedes that the telephone calls that occurred on different days, charged in counts 4, 5, 8, 11, 13, and 14, do "not fall within the purview of section 654 despite the fact that all of these calls were placed in an attempt to try and dissuade Ms. Bailey from appearing in court." (See *People v. Correa* (2012) 54 Cal.4th 331, 334 ["section 654 does not bar multiple punishment for multiple violations of the same criminal statute"].) Roberts maintains, however, that because counts 6 and 7 charged violations that occurred on the same day pursuant to the same objective of dissuading Bailey from testifying, section 654 applies to these two counts, and the trial court should have stayed the sentence the court imposed on count 7.[9] (See *People v. Jones* (2012) 54 Cal.4th 350, 353 [where section 654 applies to prohibit multiple punishments, the correct procedure is to impose sentence on each count and stay execution of sentence on the count to which section 654 applies, rather than impose concurrent sentences].)

---

[9] Roberts' failure to make this argument in the trial court does not preclude him from raising it on appeal. (See *People v. Brents* (2012) 53 Cal.4th 599, 618 [section 654 error is reviewable on appeal absent an objection because it results in an unauthorized sentence]; *People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17 ["the court acts in 'excess of its jurisdiction' and imposes an 'unauthorized' sentence when it erroneously stays or fails to stay execution of a sentence under section 654"]; *People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338 [failure to object on section 654 grounds in the trial court does not forfeit the issue on appeal].)

17

Section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." (*Id.*, subd. (a).) Although section 654 refers to a single act or omission, "[f]ew if any crimes . . . are the result of a single physical act." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another ground in *People v. Correa*, *supra*, 54 Cal.4th at p. 334.) Therefore, section 654 also applies "'where a course of conduct violated more than one statute and the problem was whether it comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654.' [Citation.]" (*Neal*, *supra*, at p. 19; see *Correa*, *supra*, at p. 335; *People v. Rodriguez* (2009) 47 Cal.4th 501, 507.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal*, *supra*, at p. 19; see *Correa*, *supra*, at p. 336; *People v. Dydouangphan* (2012) 211 Cal.App.4th 772, 780.)

Therefore, section 654 "'limit[s] punishment for multiple convictions arising out of either an act or omission or a course of conduct deemed to be indivisible in time, in those instances wherein the accused entertained a principal objective . . . .' [Citation.] But '"a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment." [Citation.] "This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken."' [Citation.]" (*People v. Petronella* (2013) 218 Cal.App.4th 945, 963-964; see *People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1289.)

"'The defendant's intent and objective present factual questions for the trial court, and its findings will be upheld if supported by substantial evidence. [Citation.] "We review the court's determination of [a defendant's] 'separate intents' for sufficient

evidence in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the trier of fact could reasonably deduce from the evidence. [Citation.]" [Citation.]' [Citation.]" (*People v. Petronella*, *supra*, 218 Cal.App.4th at p. 964.) Therefore, we uphold the court's factual determination that section 654 did not apply if it is supported by substantial evidence. (*People v. Andra* (2007) 156 Cal.App.4th 638, 640-641; see *People v. Kurtenbach*, *supra*, 204 Cal.App.4th at p. 1289 ["'[t]he determination of whether there was more than one objective is a factual determination, which will not be reversed on appeal unless unsupported by the evidence presented at trial'"].)

Although the two telephone calls charged in counts 6 and 7 occurred on the same day, there is substantial evidence that the two calls were divisible in time and temporally separated. The transcriptions of the calls contain considerable redacted portions of the conversations between Roberts and Bailey that did not relate to Bailey's court testimony, and show that some amount of time had elapsed (and some discussion of other topics had occurred) between Roberts' two acts of dissuasion that day. The transcription of the first call ends with a redacted portion, suggesting that whatever Roberts and Bailey were talking about before their first conversation ended had no bearing on the charges against Roberts. Contrary to Roberts' assertion, there is no indication in the transcriptions of the two calls, or anywhere else in the record, that the second call (count 7) occurred "shortly after" and "almost immediately" following the first call (count 6). Thus, there is substantial evidence, considered in the ""'light most favorable to the judgment,"'" that Roberts' two acts of telephonic dissuasion on September 28, 2011 were ""'temporally separated,"'" and that after the first act of dissuasion Roberts had the ""'opportunity to reflect and to renew his . . . intent before committing the next one . . . .'"" (*People v. Petronella*, *supra*, 218 Cal.App.4th at p. 964.)

E.      *The Minute Order and Abstract of Judgment Must Be Corrected*

During the oral pronouncement of sentence, the trial court enhanced Roberts' sentence by five years pursuant to section 667, subdivision (a). The trial court's minute

order of the sentencing hearing and the abstract of judgment incorrectly reflect that the trial court enhanced Roberts' sentence by five years pursuant to section 667.5, subdivision (b). Roberts contends, and the People concede, the minute order and abstract of judgment must be corrected. We agree and will order the trial court to do so. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1222, fn. 14 ["[w]hen an abstract of judgment does not accurately reflect the trial judge's oral pronouncement of sentence, this court has the inherent power to correct such an error, either on our own motion or at the parties' behest"]; *People v. Wahidi* (2013) 222 Cal.App.4th 802, 804, fn. 1 ["[t]he parties agree the abstract of judgment contains clerical errors, which we order corrected"], petn. for review pending, petn. filed Feb. 3, 2014, S216255.)

## DISPOSITION

The judgment is affirmed as corrected. The trial court is directed to prepare a corrected minute order and abstract of judgment reflecting that the five-year enhancement was imposed pursuant to section 667, subdivision (a), and to forward a copy to the Department of Corrections and Rehabilitation.


SEGAL, J.[*]


We concur:


PERLUSS, P. J.                    ZELON, J.

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.