Filed 4/23/25  P. v. Carmona CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GINA MARIE GOMEZ AND RICARDO CARMONA,<br><br>    Defendants and Appellants. | A172269<br><br>(Riverside County<br>Super. Ct. No. RIF2204320) |

This appeal arises out of events that took place when defendant Ricardo Carmona fired multiple shots at the former boyfriend of defendant Gina Marie Gomez, first in a restaurant parking lot and then shortly afterward while Carmona and Gomez were driving on a freeway in a car with Gomez's young daughter in the back seat.  Gomez and Carmona were both convicted of attempted murder based on the restaurant shooting, and Carmona was also convicted of three other counts based on the freeway incident—shooting at an occupied vehicle, assault with a firearm, and child endangerment.

On appeal, Gomez contends that the evidence does not support the conviction for attempted murder and that the trial court abused its discretion in admitting evidence of a prior crime to show she intended to aid and abet

1

Carmona in murdering the victim. Carmona contends the trial court erred in refusing to instruct the jury on the lesser included offense of attempted voluntary manslaughter and in failing to stay sentence on two of the counts under Penal Code section 654. We shall direct the trial court to amend the abstract of judgment to remedy a clerical error, and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Crimes

Gomez shares a child, Jane Doe (Jane), with John Doe (John). Jane was six years old at the time of the events at issue here. John had custody of Jane, but he allowed her to stay with Gomez two nights a week.

At the time of the crimes, Gomez and Carmona were romantically involved with each other and had begun sharing a home. At some point in March 2022, John came to Gomez and Carmona's home to pick up Jane, and he noticed Jane had a bruise on her. Jane told him Carmona had hit her. John was angry, and he sent a text to Carmona telling him, "[H]ey . . . you bitch ass mother fucker, you hit my daughter, we're going to fight." Carmona responded by denying that he had hit Jane.

John had first called Gomez and said, "[H]ey, what the hell is going on? You're going to let this punk hit my daughter?" and John told Gomez that if she did not leave Carmona he would obtain a restraining order. John said he would "whoop [Carmona's] ass." Later in a text message, John told Gomez she was "crazy" to let Carmona hit Jane and said he would obtain a restraining order "against that fool." He accused her of "defend[ing] [Carmona] over our own daughter," and said she did not "deserve to be a mother" and was "a disgrace."

John initially refused to return Jane to Gomez, and he told Gomez that he was going to take her to court for custody; at trial, he also testified that he

2

already had full custody of Jane and that the only reason Jane spent two days a week with Gomez was that he allowed it.

John eventually agreed that Jane could see Gomez. He drove Jane to Gomez's home in the early afternoon of March 28, 2022, around the time he expected Gomez to return from work. Gomez was not home, and when John called her she told him that she was still working. John took Jane out for food, and when he returned to Gomez's home she was still not there. John called Gomez again, and when she told him she was still working, he told her he would return to his home. Gomez called him back as he drove home and told him to meet her at a Jack in the Box restaurant in Riverside, where they had met several times previously for child exchanges. Gomez told John she would be there in 15 minutes.

When John arrived at the Jack in the Box about 20 minutes later, Gomez had not yet arrived. He parked and waited for her. After about 20 minutes more, Gomez arrived. John walked over to her car with Jane, who got into Gomez's car. John saw that Gomez had a phone in her lap, with the speaker on, in a position that made it difficult for him to see it. She appeared "jittery, like shaky, like her hands shaking and real bad," as if she were frightened. He asked her why she was shaking so much, then said that she should "tell that fool" not to hit Jane any more "and we can work something out." They "shook on it," and Gomez drove off.

As John began to drive away, he saw Carmona coming toward him, wearing a ski mask that covered his mouth and nose. Carmona began to shoot at his car, firing "numerous rounds," seven or eight in John's estimation, although the bullets missed John.

John drove away and called Gomez, who was "hysterically crying" as she answered her phone. He accused her of setting him up, and she said,

3

"[N]o, I would never do that," as if she knew what had happened. As John drove on the freeway, he saw Gomez's car, with Carmona in the front passenger seat as Gomez drove, taking off his face covering. John testified he could hear Gomez and Carmona screaming at each other, as Jane cried and screamed. Gomez immediately tried to swerve into John's vehicle, and from Gomez's car, Carmona shot at John then, when John was directly in back of Gomez's car, fired at him again. John hit the back corner of Gomez's car with his vehicle in an effort to get Gomez to spin around and stop. He lost control of his vehicle and hit the center divider, and Gomez drove on.

Jane testified that after Gomez drove away from the Jack in the Box, Gomez picked Carmona up from a gas station, and he got into the car. Jane was sitting in the middle of the back seat. They drove away, and Gomez and Carmona were not speaking to each other. Then Carmona began shooting a gun at John's car, firing about 10 shots as Gomez drove.

After the shooting, Gomez sent John a text asking if he would refrain from pressing charges against her if she took Jane back to him. He agreed to her request, and she returned Jane.

### The Investigation

Surveillance video showed Gomez's car pulling into the parking lot of a gas station before driving out of the parking lot. As the car drove away, video showed a man dressed all in black walking in the direction of the Jack in the Box. Video also showed him running from the Jack in the Box toward the gas station.

Employees of the gas station heard multiple gunshots coming from the direction of the Jack in the Box, and one of them saw someone who was wearing a mask or neck gaiter, a hoodie, and dark clothes run from the Jack in the Box toward the gas station and get into a waiting dark vehicle, which

4

"took off" toward the freeway. The license plate of the vehicle was covered with what looked like a bag, so the employes could not see the plate number.

Officers of the City of Riverside's police department found eight shell casings at the Jack in the Box. When they went to the site of the collision on a freeway off-ramp, they found that John's car had six bullet holes.

### *Communications Between Carmona and Gomez*

The day before the shooting, Gomez and Carmona exchanged text messages in which Gomez asked him not to " 'leave me over this' " and not to " 'do anything that's going to take you away from us' "; Carmona indicated he had waited outside John's place of employment in another city; and Carmona asked Gomez for information on where John lived and she told him she had just learned his address, at which point Carmona backed off, telling Gomez, " 'I shouldn't have put you in this position. It's better you don't know or help.' " Gomez also told Carmona that John was " 'try[ing] to act all cool now, but I know I have a long road ahead of me,' " in an apparent reference to possible custody proceedings, and Carmona responded that if John were " 'trying to be cool,' " he would bring Jane back and not take Gomez to court.

In the early afternoon of the day of the shooting, John sent a text message to Carmona telling him there was a warrant out for his arrest for hitting Jane, as well as a restraining order, and telling him " 'you better not "F" be there "B." ' " Carmona and Gomez also exchanged text messages in which they made disparaging comments about John, and Carmona assured Gomez they would get Jane back. About the time of the shooting at the Jack in the Box, Gomez sent Carmona a text telling him, " 'You guys are cool, but he has a strap on his waist.' "

After the incident, Carmona was in hiding, and Gomez knew he was hiding. In a text message of April 1, a few days after the shooting, Carmona

told Gomez, " 'We knew the job was dangerous when we said, "I do." ' " He also asked Gomez " 'How much time you figure we got? You know more than I do,' " which he testified referred the amount of time that would pass before he was caught rather than to the amount of time the two of them would serve in custody.

In a recorded telephone conversation between Carmona and Gomez when both were in jail, Carmona told Gomez he loved her and asked her to tell him she loved him. In response, she asked how he could say that and still "have [her] here," and let her "go down with [him]." Carmona told Gomez that he would "take the rap," and Gomez told him he should "open [his] mouth." After further discussion in which Gomez expressed her unhappiness at her prospects, Carmona said, "[Y]ou knew what it was the day it happened." The written transcript of the call indicates Gomez's response was unintelligible, and ended in the word "alright." We have listened to the recording that was played for the jury, and think the jury may have heard Gomez reply, "oh" before uttering the word the transcript renders as "alright." In any event, Carmona responded, "I'm not going to point finger. I did this shit," and he told Gomez that if she thought he did not love her, he was "just going to let you take the fall." Later in the conversation, after Gomez told him she had written letters to him in jail and that she loved him, he asked her whether she meant it or whether she was "saying that just to get me to take the fall."

### *Evidence of Gomez's Earlier Offense*

Over Gomez's objection, the trial court admitted evidence that Gomez acted as the getaway driver in connection with a different crime one night in

2007.[1]  The evidence came in through the testimony of the homicide detective to whom Gomez had confessed her involvement.  On the night of the 2007 offense, Gomez drove three men, one of them her boyfriend at the time, to a large house party at which the guests had paid a cover charge.  Gomez had been at the party earlier that evening.  The men decided to go back to the party and "jack [the people there] for their money," or rob them, and they told Gomez of their plan.  She drove the three men to the house where the party was being held and parked nearby.  The men got out of the car and walked to the house, while Gomez waited in the car, "doing her eyebrows."  At the house, one of the men hit someone at the party over the head with a shotgun, and the shotgun went off, killing the victim.  The injury "ripped his whole skull open down to his brain," the detective testified.  Gomez heard the gunshot from where she was waiting, and the three men ran back to the car.  One of them, who had a gun that appeared to be about 18 inches long, said that the gun had gone off accidentally when someone grabbed it, and the three men told Gomez to drive.  Gomez later told the detective that she did not realize until then that there was a gun in the car.  As Gomez drove, she passed by the spot where the victim lay outside the house.

*Carmona's Testimony*

Gomez presented no defense witnesses, but Carmona testified in his own defense.  His version of events was as follows:  Carmona and Gomez began to live together about a month before the crimes, and John was initially hostile to him.  John sent Gomez text messages saying he did not trust Carmona, and he made threats to Carmona, including threatening to

---

[1] The jury was instructed that the evidence applied only to the case against Gomez.

7

kill him.  After Carmona introduced himself to John, however, John seemed to accept the situation.

One day, after John picked up Jane, he called Gomez telling her that Carmona had hit Jane and that John would "kill [Carmona] and press charges on [him]."  John sent a text to Carmona saying, if " 'you put your hands on my daughter one more time,' " followed by an obscenity, " 'I'll kill you.' "  Carmona took the threat seriously.

Carmona acknowledged that he was the person dressed in black in the surveillance videos, that his face was fully covered except for his eyes and eyebrows when he got out of Gomez's car, and that he shot at John at the Jack in the Box.  He also acknowledged that he had a gun with him; because of "the threats and . . . other things that [were] going on in [his] life," he always carried a gun, even when using the toilet.  But, he testified, although he and Gomez had been living together for a month, she did not know that he was carrying a gun at the time.

The day of the shooting, Gomez dropped Carmona off behind the gas station because, according to Carmona, he wanted to get a soda.  He was wearing the neck gaiter and black beanie when he got out of Gomez's car; he testified that he wore the gaiter over his face because his job as a forklift operator required him to wear a face mask as a COVID-19 protocol, and because it had been cold earlier that day.

Carmona testified he did not want to accompany Gomez to the Jack in the Box because he did not trust John to behave peacefully, in light of the things he had said to Carmona.  Nevertheless, he walked to the Jack in the Box after getting out of Gomez's car.  He was under the influence of drugs and he was thinking about the things John had said to him, feeling "[a]nger, hate, disgust."

After Jane got into Gomez's car and Gomez began to drive away, Carmona saw John driving past him; Carmona threw his hands up toward John, and John "flip[ped] [him] off," making Carmona feel "[u]pset." Carmona shot his gun at John's car as it drove by, not to kill John "but to let him know that . . . I wasn't going to stand for his shit" and that he was "willing to go to any extent [John] was willing to go." He shot at the body of the car rather than at the windows because he did not want to kill John and deprive Jane of her father. He denied that he had planned the shooting, saying instead that he "just wanted to confront [John]."

Carmona then ran to the gas station, where he knew Gomez would meet him and pick him up, and he told her, " 'Let's go.' " They drove away and entered the freeway, and he told her what had happened, and she became upset with him. As they drove at a high speed, their car was hit in the rear more than a dozen times by a car John was driving. Fearing for his own life and those of Gomez and Jane, Carmona fired his gun out the rear window, believing he was acting in self-defense.

At trial, Carmona denied that he and Gomez had ever made a plan to shoot John or that either he or Gomez knew in advance that he would do so. After the shooting, Gomez told him to leave their home, but they later resumed their relationship.

When asked at trial whether he claimed self-defense in connection with the shooting at the Jack in the Box, Carmona replied, "I'm claiming stupidity at the Jack in the Box."

***Verdicts and Sentencing***

The jury convicted both Gomez and Carmona of attempted murder (Pen. Code, §§ 187, 664; count 1), and found true special allegations as to both that the offense was committed willfully and with deliberation and

9

premeditation, and as to Carmona that he personally discharged a firearm (Pen. Code, § 12022.53, subd. (c)). In the remaining counts, charged against Carmona only, it found him guilty of shooting at an occupied motor vehicle (Pen. Code, § 246; count 2), assault with a firearm (Pen. Code, § 245, subd. (a)(2); count 3), with a special allegation that he personally used a firearm in committing count 3 (Pen. Code, § 12022.5, subd. (a)), and child abuse likely to create great bodily injury or death (Pen. Code, § 273a, subd. (a); count 4). In connection with counts 2 and 4, it found true special allegations that he personally used a firearm (Pen. Code, § 12022.5, subd. (a)).

The trial court sentenced Gomez to seven years to life in prison for attempted murder. As to Carmona, it first concluded that section 654 did not apply because each offense arose from "separate operative circumstances" and that consecutive sentencing was appropriate. The court sentenced him to a prison term of seven years to life for attempted murder, with an additional 20 years for the firearm enhancement. As to the remaining counts, it imposed a sentence for child abuse of the middle term of four years, with an additional four years for the firearm enhancement; and for the other counts consecutive terms of one-third the middle term, or one year and eight months for shooting at an occupied motor vehicle and one year for assault with a firearm, with an additional one year, four months for the firearm enhancement. The total term was thus a determinate term of 32 years, plus an indeterminate term of seven years to life.

Although the parties do not raise this point in their briefs on appeal, the court notes that the abstract of judgment for Carmona's determinate term contains a clerical error. It correctly sets forth the sentences imposed for each of his various offenses and enhancements, but mistakenly calculates

10

the resulting total determinate term as 37 years rather than 32 years. We shall direct the trial court to correct this error.[2]

## DISCUSSION

### I. Carmona's Appeal

#### *A. Instructional Error*

Carmona contends the trial court erred in refusing his request to instruct the jury on attempted voluntary manslaughter based on heat of passion or imperfect self-defense, a lesser included offense of attempted murder.

A trial court must instruct a jury on a lesser included offense " 'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*People v. Barton* (1995) 12 Cal.4th 186, 194–195.) Manslaughter, which occurs when a defendant kills intentionally and unlawfully but lacks malice, is a lesser included offense of murder. (*Id.* at p. 199.) This occurs in only in "limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion' ([Pen. Code,] § 192, subd. (a)), or when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense." (*Ibid.*)

Carmona asked the trial court to instruct the jury on attempted voluntary manslaughter, a lesser included offense of count 1, attempted murder, based on heat of passion. The trial court declined the requested instruction, noting that some time had passed since John and Carmona last

---

[2] On January 2, 2025, this case was fully briefed. On January 15, 2025, the case was transferred by California Supreme Court Order from the Fourth Appellate District, Division Two (where it had been designated case No. E082748) to the First Appellate District.

11

exchanged text messages, and concluding that the evidence did not show Carmona was sufficiently provoked by the only insult John offered at the scene, "flipping [Carmona] off."

Carmona contends this ruling constituted prejudicial error. He points to the evidence that he was under the influence of methamphetamine, that John had previously accused Carmona of hitting Jane and made threatening comments to him, and that John repeatedly collided with the vehicle Carmona was riding in on the freeway, and he argues that the evidence supports an inference that when he shot at John he was provoked by John's actions and that he was acting in perceived self-defense.

This contention fails on its face because the attempted murder charged was based not on the freeway shootings but on the shooting at the Jack in the Box. During her closing argument, the prosecutor told the jury that the attempted murder count was based solely on the events at the Jack in the Box, when Carmona fired eight rounds at John's car as he drove out of the parking lot, and that the remaining counts—none of them attempted murder—were based on Carmona's conduct when he shot at John's car while driving on the freeway. Specifically, the prosecutor said, "[T]he attempted murder is the Jack in the Box shooting. . . . [T]he freeway conduct is Counts 2, 3, and 4. Count 1 is Jack in the Box." "[I]n counts 2, 3, and 4, [Carmona] is charged with shooting at an occupied car on the freeway. He's charged with assault with a firearm, and he's charged with child endangerment that could have caused great bodily injury or death to that child." Carmona's argument on appeal appears to be based on a misunderstanding of the basis of the attempted murder charge.

Carmona makes no showing that he was either sufficiently provoked or acted in unreasonable self-defense when he tried to kill John at the Jack in

12

the Box. In assessing whether provocation is sufficient to support a finding of manslaughter, " 'the question is whether the average person would *react* in a certain way: with his reason and judgment obscured.' [Citation.] However, the provocation must go beyond 'mundane annoyances,' even if they might make an ordinary person 'act[] imprudently or out of anger.' [Citation.] Heat of passion requires 'extreme intensity.' [Citation.] 'This passion must be a " ' " [v]iolent, intense, high-wrought or enthusiastic emotion.' " ' " ' " (*People v. McShane* (2019) 36 Cal.App.5th 245, 255–256.) And, "[i]f sufficient time has elapsed for one's passions to 'cool off' and for judgment to be restored," a killing is not reduced to manslaughter. (*People v. Beltran* (2013) 56 Cal.4th 935, 951.)

In the days before the shooting, John had sent hostile text messages to Carmona, but Carmona does not contend that these texts provided sufficient provocation in themselves to reduce the killing to manslaughter or that, even if they did, at the time of the shooting he remained under the influence of a violent, intense passion as a result of them. The only possible provocation at the Jack in the Box was John's hand gesture, but Carmona makes no effort to argue that such a gesture, however vulgar, would cause an average person to react without judgment or reason. (C.f. *People v. Moye* (2009) 47 Cal.4th 537, 551 [victim's act of kicking defendant's car insufficient provocation for manslaughter]; *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 [taunting words insufficient provocation for manslaughter instruction]; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 83 [cutting defendant off in traffic might anger ordinary person but insufficient to support voluntary manslaughter instruction].) Nor is there any evidence that John offered any threat to Carmona at the Jack in the Box that would support a conclusion Carmona

13

believed he needed to defend himself; rather, the only evidence is that John was driving away after giving Jane to Gomez.[3]

We therefore reject Carmona's contention that the trial court erred in failing to instruct the jury on the lesser included offense of attempted voluntary manslaughter.

### B. Consecutive Sentences

The trial court imposed consecutive sentences for each of the four counts against Carmona. He contends the court should instead have stayed the sentence as to either count 1, the attempted murder of John and or count 3, assault on John with a firearm. He also contends punishment for count 2, firing at an occupied motor vehicle, should have been stayed because he had already been punished for attempted murder and count 4, child endangerment. We find no sentencing error.

Section 654 prohibits a court from imposing punishment under more than one statutory provision for "[a]n act or omission that is punishable in different ways by different provisions of law." (Pen. Code, § 654, subd. (a).) If two or more offenses fall within this rule, the trial court must stay punishment for all but one of them. (*People v. Siko* (1988) 45 Cal.3d 820, 823.)

This rule applies not only to offenses based on a single act, but also those that arise from a "single, indivisible course of conduct." (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1112 (*DeVaughn*); *People v. Latimer* (1993) 5 Cal.4th 1203, 1207–1208.) Whether a course of conduct is divisible for these purposes " 'depends on the *intent and objective* of the actor. If all of

---

[3] At trial, Carmona relied on a theory of self-defense for the shootings on the freeway—not the events at the Jack in the Box—and the jury was instructed on self-defense as to counts 2, 3 and 4.

the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*Latimer*, at p. 1208.) Courts have found separate objectives when they were "(1) consecutive even if similar or (2) different even if simultaneous." (*People v. Britt* (2004) 32 Cal.4th 944, 952.) The trial court has "broad latitude" to determine whether section 654 applies to the facts of a case, and we review its determination for substantial evidence, viewing the evidence in the light most favorable to its decision and presuming every fact the court could reasonably deduce from the evidence. (*DeVaughn*, at p. 1113.)

In carrying out our review, we bear in mind two rules pertinent to Carmona's claims. First, section 654 does not prohibit multiple punishment for violent crimes involving separate victims. (*People v. Oates* (2004) 32 Cal.4th 1048, 1063.) That is because " '[t]he purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability. A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable that a defendant who harms only one person." (*Ibid*.; accord, *People v. Dydouangphan* (2012) 211 Cal.App.4th 772, 781 [applying rule to convictions for shooting at occupied vehicle and manslaughter].)

Second, multiple punishment is permissible when there has been enough time between multiple acts for the defendant to " ' "reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." ' " (*DeVaughn, supra*, 227 Cal.App.4th at p. 1113; *People v. Andra* (2007) 156 Cal.App.4th 638, 640.)

15

This rule has been applied in circumstances similar to those before us now.  The defendant in *People v. Trotter* (1992) 7 Cal.App.4th 363, fired a gunshot at a police car, then fired two more shots, one about a minute later and the other seconds thereafter.  The appellate court upheld the trial court's imposition of separate punishment for two counts of assault.  (*Id*. at pp. 366–368.)  It explained that "[e]ach shot required a separate trigger pull . . ., separated by periods of time during which reflection was possible," and each act of violence put others on the freeway in danger.  (*Id*. at p. 368.)  The court analogized the case to those in which different acts of sexual penetration were properly punished separately, and explained that the defendant " 'should . . . not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his . . . assaultive behavior.' "  (*Ibid*., quoting *People v. Harrison* (1989) 48 Cal.3d 321, 338.)  The defendant in *Trotter* likewise had time before each of the three shots to reflect and consider his next action.  (*Trotter*, at p. 368.)

Applying the same rule, the court in *People v. Phung* (2018) 25 Cal.App.5th 741, found no error in the imposition of sentence for shooting at an occupied motor vehicle, an offense that the defendant contended was based on the same act and continuous course of conduct as his convictions for murder and attempted murder—that is, sitting in the back of a car during a shooting.  (*Id*. at p. 759.)  The appellate court concluded there was substantial evidence of a separate intent and objective for each offense:  five bullets were shot at a vehicle containing eight people; "[e]ach of the five gunshots involved a consecutive (albeit similar) intent and objective"; and, as in *Trotter*, each " 'constituted a separate risk' " to the passengers.  (*Id*. at p. 761.)  Because it reached this conclusion, the court did not consider whether the multiple victim exception applied.  (*Id*. at p. 761, fn. 11.)

16

These authorities lead us to reject Carmona's contention that he could not properly be sentenced for all four counts against him. He argues that all his gunshots had the single objective of killing John. But viewed in the light most favorable to the trial court's decision, the evidence showed Carmona had time to reflect and renew his intent between the various gunshots. He first shot at John's car multiple times at the Jack in the Box before returning to Gomez's car and riding in it as she drove onto the freeway. There was thus a clear separation in time between count 1, the attempted murder at the Jack in the Box, and the remaining counts. The question of whether counts 2 and 3—shooting at an occupied vehicle and assault with a firearm, both based on events on the freeway—reflected separate intents is closer. These crimes had the same victim: John was the only occupant of the vehicle at which Carmona shot, and he was the sole named victim of the assault charge. Nevertheless, we conclude the record is sufficient to support the trial court's ruling. John testified that when he saw Gomez's car on the freeway, they were in different lanes of traffic, Gomez swerved into his lane as Carmona fired at John. John was then directly behind Gomez's car, and Carmona fired again as, or just before, John rammed the back of Gomez's car. The trial court could reasonably conclude that before shooting again on the freeway Carmona had time to " ' "reflect and to renew" ' " his intent, and that his decision to continue shooting " ' "thereby aggravate[ed] the violation of public security or policy already undertaken." ' " (*DeVaughn, supra*, 227 Cal.App.4th at p. 1113.)

The remaining count, child endangerment, had a different victim, based on the risk Carmona caused to Jane, who was sitting in the back seat

17

of the car Carmona rode in as he was shooting back at John's car.[4]  We are satisfied that the multiple victim exception to the application of section 654 applies to these facts.

## II.    Gomez's Appeal

### A. Sufficiency of Evidence of Attempted Murder

Gomez contends the evidence is insufficient to support her conviction of attempted murder.  Our review of this contention is deferential.  The test is " ' "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738–739.)  We " ' "view the evidence in the light most favorable to the People and . . . presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*Id.* at p. 739.)  Although the evidence must be " ' "reasonable, credible, and of solid value," ' " it is the jury, not we, that must be persuaded of the defendant's guilt, and " ' " ' " '[i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " (*People v. Jones* (2013) 57 Cal.4th 899, 960–961 (*Jones*).)

The crime of attempted murder requires a showing of " 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)  Intent to kill may be inferred from the defendant's statements and actions and the circumstances of the crime.  (*Ibid.*)

---

[4] Carmona's argument that the trial court could not properly sentence him both for child endangerment and for firing at a motor vehicle seems to be based in part on a mistaken belief that Jane was riding in *John's* occupied motor vehicle.

The case against Gomez was based on the theory that she aided and abetted the attempted murder. As the jury was instructed, aider and abettor liability requires proof of three things: the direct perpetrator committed a crime; the aider and abettor knew of the direct perpetrator's unlawful intent and intended to provide assistance; and the aider and abettor in fact assisted the perpetrator's commission of the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) Where, as in the case of attempted murder, the offense is a specific intent crime, " 'the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." ' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)

Bearing in mind our deferential standard of review, we conclude the evidence is sufficient to support a finding that Gomez knew of Carmona's intent to kill John and acted to facilitate his crime. There is evidence that she knew before the shooting that Carmona was upset with John and was trying to find him; because she was living with Carmona, it could be inferred that she knew he carried a gun at all times; she dropped Carmona off at a nearby gas station rather than bringing him with her to the Jack in the Box to pick up Jane, and she met him at the same location afterward; Carmona was wearing clothing that disguised his face as he left her car at the gas station; and Gomez's license plate was covered, further making identification difficult. When John brought Jane to Gomez's car, he noticed that she had a phone in her lap with the speaker on, positioned so it was hard for him to see it, and she appeared "jittery, like shaky, like her hands shaking and real bad." Gomez texted Carmona and warned him that John was carrying a " 'strap.' " Jane testified Gomez and Carmona did not talk with each other

when they were driving, but when John called her she seemed know what had happened, crying hysterically and denying she had set him up. From these facts, the jury could reasonably conclude Carmona planned to kill John and escape undetected, and that Gomez intended to assist him in his plan by dropping him off at the gas station, letting him know what was happening at the Jack in the Box, and helping him escape from the scene of the crime afterward.

Gomez's subsequent actions and communications reinforce this conclusion. After she picked up Carmona and saw John's car on the freeway, she swerved toward him, giving Carmona another opportunity to shoot at John. She later asked John not to press charges against her. And she had text and telephone communications with Carmona that are susceptible to an inference that both of them were involved in the attempted murder. Among them, in a telephone conversation in jail after the crime, Carmona told Gomez she "knew what it was the day it happened," and rather than denying it she seemed to respond, "Oh" and "alright." The jury could reasonably view Gomez's response, made in the context of their discussion of Carmona "tak[ing] the rap" for her, as further indication she knew of and shared his intent.

Rather than grappling with this evidence in her opening brief, Gomez draws our attention to *other* evidence that might suggest she was unaware Carmona intended to kill John: Gomez sent Carmona text messages asking him not to do anything that would take him away from the family, indicating she had a " 'long road' " ahead of her, and telling him he and John were " 'cool,' " although John had a " 'strap.' " When John called Gomez immediately after the shooting, she was "hysterically crying" and denied she had set John up. But the issue is not whether the jury might have concluded

20

from the evidence Gomez was not guilty of attempted murder; it is whether the evidence supports the verdict the jury actually reached. (*Jones*, *supra*, 57 Cal.4th at pp. 960–961.)

Gomez also argues the evidence proves no more than that she knew Carmona might behave aggressively toward John, not that he intended to kill John, but we think the efforts to conceal Gomez's license plate and Carmona's face belie that theory. If Gomez and Carmona had expected John to survive the aggressive behavior Carmona planned, they would have had no reason to engage in these camouflaging efforts. John would certainly have recognized Gomez and might well have recognized Carmona, even disguised; indeed, they would have wanted him to, if Carmona was simply seeking to send a message that he "wasn't going to stand for" the way John had been treating him. Only if strangers were going to be the only witnesses able to tie them to the crime would these efforts to conceal their identities make sense.

In short, we find there is substantial evidence to support the verdict against Gomez, and we will not disturb her conviction on this ground.

### B. Admission of Evidence of 2007 Shooting

We come, finally, to the issue we found most difficult in this case. As explained above, the trial court admitted evidence, over Gomez's objection, that she previously acted as a getaway driver while her then-boyfriend and two others went to a party to rob the participants and ended up shooting and killing one of them.

### 1. Additional Procedural History

Before trial, the People moved to admit evidence of the 2007 incident. After the parties argued the matter, the trial court explained that it had spent "quite a bit of time" considering the issue, had consulted with colleagues and a retired appellate court justice, and had in the past done

21

extensive research on issues under Evidence Code section 1101.[5]  In a remark
pertinent to Gomez's argument on appeal, the court continued, "The law
favors the admission of [section] 1101 evidence, specifically when you look at
much of the case law that follows [sections] 1101 or 1108 or 1109, as it is the
case, favors the admission of these issues."  The court then conducted its
analysis under sections 352 and 1101.  It found the uncharged prior offense
"highly relevant" to show Gomez's intent, as she had previously acted as a
getaway driver in a homicide, confessed, and was convicted, and she was
currently charged with being the getaway driver in an attempted murder.
The court noted there was a "reasonable argument" the prior offense was too
remote in time to be relevant, but concluded that argument was rebutted by
Gomez's confession and conviction for the prior offense, and by the "high
degree of similarity and circumstances."  And it concluded the evidence would
not confuse or mislead the jurors.

The court thus found the evidence both relevant and probative of intent
for purposes of section 1101, subdivision (b), and found its probative value
was not outweighed by the possibility of undue prejudice.  The court admitted
the evidence outlined above, and instructed the jury that it could consider the
evidence only for the limited purpose of deciding whether Gomez acted with
the intent to commit attempted murder, taking into account the degree of
similarity between the charged and uncharged offenses.

### 2.  Section 1101

Section 1101 generally prohibits evidence of a person's prior acts to
prove his or her conduct on a particular occasion.  (§ 1101, subd. (a).)  This
provision " 'expressly prohibits the use of an uncharged offense if the only
theory of relevance is that the accused has a propensity (or disposition) to

---

[5] All further statutory references are to the Evidence Code.

commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense.' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 25 (*Chhoun*).)  But that prohibition does not prevent admission of evidence of a person's prior bad acts to prove a fact (including motive, intent, preparation, plan, knowledge, or absence of mistake or accident) *other than* the disposition to commit such an act, subject to a limiting instruction on request.  (§ 1101, subd. (b); *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 406.)

Evidence of uncharged offenses may be admitted to show identity, common plan, or intent " ' "only if the charged and uncharged crimes are sufficiently similar to support a rational inference" on these issues.' [Citation.]  The degree of similarity varies depending on the purpose for which the evidence is offered.  'The least degree of similarity . . . is required in order to prove intent.' [Citation.]  For this purpose, 'the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' " (*Chhoun, supra*, 11 Cal.5th at p. 25.)  Our high court has explained that "the doctrine of chances teaches that the more often one does something, the more likely that something was intended, and even premeditated, rather than accidental or spontaneous." (*People v. Steele* (2002) 27 Cal.4th 1230, 1244.)

Even if the evidence of uncharged conduct is relevant under these standards, the trial court must also determine whether its probative value is outweighed by the danger of undue prejudice, confusing the issues, or misleading the jury.  (*Chhoun, supra*, 11 Cal.5th at p. 26, citing § 352.)

In sum, the court must make an " ' "extremely careful analysis" ' " of the evidence, considering the "(1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to prove or disprove the

material fact (i.e., probative value); and (3) the existence of any rule or policy requiring the exclusion of relevant evidence (i.e., prejudicial effect or other § 352 concern)." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238 (*Hendrix*).) The evidence should be excluded " '[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear.' " (*People v. Williams* (2018) 23 Cal.App.5th 396, 420 (*Williams*), italics omitted.)

We review the trial court's decision for abuse of discretion, not reversing unless the court exercised its discretion in a manner that was arbitrary, capricious, or absurd. (*Chhoun, supra*, 11 Cal.5th at p. 26.) One way in which a court may abuse its discretion is by applying incorrect legal standards. (*People v. Nakano* (2023) 89 Cal.App.5th 623, 635–636.) In determining whether it has done so, we consider " ' " 'the legal principles and policies that should have guided the court's actions.' " ' " (*Williams, supra*, 23 Cal.App.5th at p. 417.)

### 3. Analysis

Gomez contends the trial court confused the standards applicable to section 1101 with those that govern admission of evidence under sections 1108 and 1109 and, in so doing, abused its discretion. She points to the court's statement, made before it conducted its analysis of the admissibility of the evidence of the 2007 offense, that "much of the case law that follows [sections] 1101 or 1108 or 1109 . . . favors the admission of these issues." Gomez argues this comment misstated the law because section 1101 provides no presumption of admissibility. Gomez is correct that there is no presumption favoring the admissibility of section 1101, subdivision (b) evidence, but we conclude she has not shown the trial court misunderstood or misapplied the law.

Sections 1108 and 1109 establish exceptions to section 1101's general prohibition on admission of evidence of a prior act to show propensity to commit the charged offense. Under these provisions, when a person is charged with a sexual offense (§ 1108) or an offense involving domestic violence (§ 1109), evidence of a prior offense involving the same type of conduct "is not made inadmissible by section 1101," if section 352 does not otherwise render it inadmissible. (§§ 1108, subd. (a), 1109, subd. (a).) Under these statutes, " ' " '[a]s with other forms of relevant evidence that are not subject to any exclusionary principle, *the presumption will be in favor of admission*' " ' " (*People v. Loy* (2011) 52 Cal.4th 46, 62; accord, *People v. Merriman* (2014) 60 Cal.4th 1, 42), and we do not apply " ' "more exacting requirements of similarity between the charged offense and the defendant's other offenses" ' " (*People v. Soto* (1998) 64 Cal.App.4th 966, 984 (*Soto*)).

Section 1101, on the other hand, does not establish an exception to the general rule against propensity evidence, though it does allow evidence of prior acts to be used for *other* purposes, including to show intent. (§ 1101, subd. (b).) To decide whether evidence is admissible under this rule, the trial court must conduct the careful analysis we have discussed above, considering whether the offenses are similar enough to support a rational inference of intent, as well as the risk of undue prejudice under section 352. (*Chhoun*, *supra*, 11 Cal.5th at pp. 25–26.)

Although the trial court's initial comments appeared to conflate the standards governing section 1101 on one hand and sections 1108 and 1109 on the other, we are satisfied in making its ruling the court applied the correct legal standards, with their " 'exacting requirements of similarity' " between the charged and uncharged offense. (*Soto*, *supra*, 64 Cal.App.4th at p. 984.) That is, the court expressly considered the relevance the uncharged prior

offense, its similarity to the charged offense, the effect of the passage of time between the two offenses, the degree of certainty that Gomez committed the 2007 crime, and the possibility of prejudice or confusion from admission of the evidence. In so doing, the court did not simply presume the evidence, because relevant, was admissible, but subjected it to the necessary " ' "extremely careful analysis." ' " (*Hendrix*, *supra*, 214 Cal.App.4th at p. 238.) We thus reject Gomez's contention that the trial court abused its discretion by applying an incorrect legal standard in deciding whether to admit the evidence of Gomez's 2007 offense.

Nor do we see any other abuse of discretion in the trial court's decision to admit the evidence. The two events shared striking similarities: in each case, Gomez drove (or was accused of driving) a boyfriend to a place where he intended to commit a crime; in each case someone who left Gomez's car was armed with a gun and shot at a victim; and in each case the perpetrator returned to Gomez's car, as arranged, to be driven away from the scene of the crime. Under the doctrine of chances, it may be seen as unlikely that Gomez would act as a getaway driver for a violent crime for a second time by chance. Although there was graphic testimony that the victim in 2007 suffered a grievous injury and died—unlike John in the charged offenses—the trial court could reasonably conclude the evidence was relevant to the material question of whether Gomez intended to assist Carmona in his crime or whether she was merely an innocent bystander who thought Carmona was planning to buy a soda at the gas station.

Disagreeing with this conclusion, Gomez points out that the evidence of the 2007 crime suggests she and the direct perpetrators intended only to rob the victims, not to kill anyone, and that on this basis the two crimes are too dissimilar to show she intended to commit the charged offense of attempted

26

murder. (Compare *People v. Stone* (2009) 46 Cal.4th 131, 136 [attempted murder requires specific intent to kill] with *People v. Anderson* (2011) 51 Cal.4th 989, 994 [robbery requires specific intent to deprive victim of property permanently].) But section 1101, subdivision (b) does not require the two crimes to be identical; it only requires the instances of misconduct to be similar enough to support an inference that the defendant " ' " 'probably harbor[ed] the same intent in each instance.' " ' " (*Chhoun, supra*, 11 Cal.5th at p. 25.) And even if Gomez originally intended only to facilitate a robbery in 2007, by the time she drove the direct perpetrators away from the scene of the crime she knew she was aiding the getaway of an armed man who had just shot someone and left him lying in the street. This was the same intent—to help a shooter flee the scene of his crime—that the prosecution sought to prove Gomez had when she drove Carmona away from the gas station.

Section 1101, subdivision (b) does not require the *purpose* of the crimes to be the same. For instance, in *People v. Foster* (2010) 50 Cal.4th 1301, our high court upheld admission of evidence of prior crimes the defendant had committed for the purpose of sexual gratification, even though the current offenses of murder and robbery did not show such a hallmark, where the incidents all proceeded in a characteristic manner, beginning with the robbery of a woman alone in an office and ending in a violent confrontation. (*Id*. at pp. 1329–1330.) Here, each crime began with Gomez driving her boyfriend to commit a crime, proceeded to an armed confrontation involving shots fired while Gomez waited in the car, and concluded with Gomez driving the shooter from the scene. In each case, the actions Gomez took to assist the direct perpetrator were similar, and the trial court reasonably concluded that evidence of the prior crime was, therefore, probative of her intent in this case.

Gomez relies primarily on two cases, *Williams*, *supra*, 23 Cal.App.5th 396 and *People v. Dryden* (2021) 60 Cal.App.5th 1007 (*Dryden*) to argue the two offenses were too dissimilar to allow admission of evidence of the 2007 offense, but neither assists her. The defendant in *Williams* stabbed and killed his wife as they argued about her intent to leave him. (*Williams*, at pp. 400, 402–403.) The trial court admitted evidence that more than 20 years previously, the defendant shot the mother of his estranged wife when she intervened as he grabbed at his wife. (*Id*. at pp. 401, 418.) The appellate court concluded the two incidents were too dissimilar to have a " 'tendency in reason' " to prove the defendant's mental state during the charged offense. (*Id*. at p. 413, quoting § 210.) In the earlier incident, the defendant sought to *preserve* his marriage, and in the second his action would necessarily destroy it. (*Williams*, at p. 419.) Although each act involved domestic violence and a troubled marriage, nothing in the earlier incident suggested the defendant acted with premeditation or deliberation in the charged offense, as was alleged. (*Id*. at p. 420.) Here, on the other hand, Gomez behaved in a similar manner during each incident, and in each case her actions assisted her boyfriend in committing a violent crime by helping him escape from the scene of a shooting for which he was culpable.

The defendant in *Dryden* was convicted of two counts of assault with a deadly weapon, and he contended the trial court erred in admitting evidence of two uncharged acts to prove he did not act in self-defense. (*Dryden*, *supra*, 60 Cal.App.5th at p. 1013.) In connection with the charged offenses, which occurred in 2013, the defendant claimed he acted in self-defense against a group of young men who " 'rat-packed' him." (*Id*. at p. 1019.) To rebut that defense, the prosecution submitted evidence of previous altercations in which the defendant had also claimed self-defense. (*Ibid*.) In 2007, the defendant

28

had injured his own father in his home by strangulation and initially claimed self-defense. (*Id*. at pp. 1019–1020.) Evidence of this incident, the appellate court concluded, should not have been admitted because it did not increase the likelihood that the defendant fabricated a self-defense claim several years later during an incident with a group of strangers in a public place, and the incidents had "no similarities in circumstance or shared logical nexus." (*Id*. at pp. 1020–1021.) In 2012, while intoxicated, the defendant struck a homeless person, whom he knew, in the head, claimed self-defense, and was acquitted at trial. (*Id*. at p. 1020.) As to that incident, the appellate court concluded that under the doctrine of chances, the two violent encounters supported an inference that the defendant did not act with an innocent mental state (although it also found the evidence, as presented, unduly inflammatory under section 352). (*Id*. at pp. 1022–1023.) For the reasons we have explained, the trial court here could reasonably conclude Gomez's history of once acting as a getaway driver for a boyfriend's crime increased the likelihood that when it happened again, she was intentionally assisting the direct perpetrator to flee the scene of his violent crime.

We recognize that the earlier incident took place 15 years before the charged crime, a significant lapse in time. As Gomez points out, it is appropriate for a court to consider the remoteness of prior conduct when evaluating prior conduct under section 352. (*People v. Harris* (1998) 60 Cal.App.4th 727, 739.) The trial court did not ignore that factor, instead weighing it against the certainty that Gomez had committed the crime and the similarity of the circumstances. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 285 ["significant similarities between the prior and the charged offenses may 'balance[] out the remoteness' "].) There is no hard and fast rule governing when a prior offense is too stale to be probative under

29

section 1101 (*ibid*.), and longer periods have been found not impermissibly remote.  (See, e.g., *People v. Spector* (2011) 194 Cal.App.4th 1335, 1388–1389 [prior incidents between eight and 28 years previously]; *Branch*, at pp. 284– 285 [30-year gap between prior and current offenses].)  In our view, the trial court acted within its discretion in determining that the 15-year gap between the two incidents did not render evidence of the 2007 offense inadmissible.

Gomez also contends the evidence of the uncharged offense was unduly prejudicial because the jury might have been swayed by the belief that she escaped punishment for her earlier conduct and might have sought to punish her for it now.  (See *Dryden*, *supra*, 60 Cal.App.5th at p. 1024 [jury aware defendant had been acquitted of earlier charge].)  We see no reason to be concerned that happened here, since the evidence showed that Gomez confessed to her involvement in the 2007 crime that ended in a person's death.  In any case, it was Gomez herself who asked the trial court not to allow evidence that she was arrested or convicted in connection with the 2007 offense, for which she pled guilty to voluntary manslaughter.  She cannot complain on appeal that the trial court granted her request.

## DISPOSITION

The clerk of the superior court shall prepare a new determinate abstract of judgment for Carmona reflecting that the total determinate term is 32 years.  It shall then forward a copy of the amended abstract to the California Department of Corrections and Rehabilitation.  In all other respects, the judgments against Carmona and Gomez are affirmed.

TUCHER, P. J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*People v. Gomez and Carmona* (A172269)